Filed 3/21/25  P. v. Richardson CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062822 |
| v. | (Super. Ct. No. C-71141) |
| JOHN MITCHELL RICHARDSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Michael A. Leversen, Judge. Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Lynn E. McGinnis and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

In May 1988, defendant John Mitchell Richardson planned and assisted in an attempted armed robbery of a check cashing business in Santa Ana. Evidence shows he gave his accomplice, Gerald King, a gun to use in the robbery. The evidence also shows Richardson was aware King might shoot someone. On the day of the attempted robbery, King and the business owner got into a scuffle. Both men shot each other and died. Richardson was found guilty of murder and sentenced to 26 years to life in prison. He later filed a petition for resentencing under former Penal Code section 1170.95 (since renumbered to section 1172.6).[1] After an evidentiary hearing, the trial court denied the resentencing petition on grounds Richardson was a major participant in the robbery and had acted with reckless indifference to human life.

Richardson appeals the trial court's denial of his petition. He contends there in insufficient evidence to support the court's reckless indifference finding. We disagree. The record shows Richardson was one of the masterminds behind the robbery, he gave King the gun that was used in the murder, he knew King was capable of violence, and he took no steps to minimize the risk of violence occurring. Due to these factors, we affirm the order.

FACTS AND PROCEDURAL HISTORY

I.

THE UNDERLYING CRIME

On May 2, 1988, Harley Curtis drove a car carrying Richardson and King. He parked the car about 75 yards from Cash Unlimited, a check

---

[1] All further undesignated statutory references are to the Penal Code.

cashing business in Santa Ana, sometime around 8:30 a.m. Cash Unlimited opened at 9:00 a.m. It was located in a downstairs suite of a two-story office building. The office building had a hallway that divided the downstairs in half.

After the car was parked, Richardson and King exited the car and walked to Cash Unlimited together. When they arrived, there were already three other customers (the customers) waiting outside the office building for Cash Unlimited to open. Richardson and King initially waited outside the building with the customers. King then entered the office building, and the customers followed him inside. Richardson remained outside the building for a few minutes then also entered. Inside the building's hallway, King smoked and paced back and forth. Richardson remained further down the hall from Cash Unlimited's door. One of the customers testified at trial that she did not see Richardson and King talk to each other after they arrived at Cash Unlimited.

Cash Unlimited was owned by David Brower and his father, Phillip Brower.[2] On May 2, they arrived at Cash Unlimited between 8:55 and 9:00 a.m. Philip was armed with a gun. A witness testified that the customers had been in the hallway for about 10 minutes before the Browers arrived. The Browers walked to Cash Unlimited to unlock the door, which had two locks. When David put his key into the first lock, he saw King's hand pointing a gun at him. The gun was close to his body, but it was not touching him.

Phillip was standing next to David. Phillip said, "'What's going on here?'" David heard a voice from behind him respond, "'just open the damn

---

[2] We refer to these individuals by their first name since they share a surname, and we refer to them collectively as the Browers.

door.'" A witness saw King put his arm around Phillip. She then saw Phillip turn toward King. Suddenly, there was a short scuffle, and King and Phillip fired shots at each other. It is unclear who fired first, but multiple witnesses at trial stated the shooting occurred quickly. Phillip fell backward onto one of the customers. The customers ran away, and David called the police. Both King and Phillip died from their respective gunshot wounds.

The evidence at trial showed that Richardson did not say or do anything to either David or Phillip. It appears he remained near the customers when King approached the Browers. Richardson ran back to the car when the shooting started, and he and Curtis sped off together. Richardson told Curtis he thought King had been shot. Richardson was arrested later that day and interviewed by police.

In Richardson's police interview, he initially denied any involvement in the Cash Unlimited robbery. He also gave a false name (James Lemar Jones) and told police he was 19 years old (he was 17 years and 10 months). However, Richardson eventually admitted that he needed cash, so he and King decided to rob Cash Unlimited. Richardson later spoke to Curtis on the phone about the idea. Richardson had been to Cash Unlimited in the past and thought it would be easy to rob. Richardson had a gun, which he had previously bought for $150. Prior to the robbery, Richardson gave the gun to King. King purportedly said, "'I'll do all the work.' . . . You know, you've got the gun and I'll do it . . . ." Richardson said he saw King loading the gun in the car on the way to Cash Unlimited. He claimed they had just intended to rob Cash Unlimited and "there wasn't suppose[d] to be any shooting."

Richardson also testified at trial. His trial testimony mostly matched his police interview. At the time of the robbery, Richardson had

4

known King for about one and a half years, and they had been roommates for "some time before the robbery." Richardson admitted that he had told King he needed money and had suggested that Cash Unlimited "might be easy to rob." Richardson knew King was a gang member but denied being in a gang himself.

Richardson also testified that both he and King planned the robbery, but it was his idea to recruit Curtis as the getaway driver. Richardson also admitted to buying the gun that King used during the robbery and giving that gun to King. Richardson claimed the gun was unloaded when he gave it to King and that he did not give King the gun to use in the robbery. Rather, he claimed to have given King the gun to "put it up inside the apartment."[3]

According to Richardson's trial testimony, he was supposed to handle crowd control during the robbery. He was tasked with telling the customers at Cash Unlimited that the business was being robbed and ensuring that they stayed silent and kept their hands visible. He stated that he was unarmed during the robbery.

Richardson also claimed that he got cold feet when they arrived at Cash Unlimited, and he told King that he did not want to go through with the robbery. King purportedly frowned at him and said, "man, what are you talking about[?]" Richardson testified he was scared because King had a gun. He believed that if he did not participate in the robbery, King would think he was "punking out" and shoot him.

---

[3] Richardson's testimony was unclear as to when he gave King the gun.

## II.

### EVIDENCE OF PRIOR ROBBERY

The prosecution presented evidence that Richardson and King had robbed a different check cashing business in Santa Ana on April 4, 1988, a month prior to the Cash Unlimited robbery. The business owner (the owner) and his wife arrived at their business at 9:30 a.m., a half hour before it opened. After they arrived, the wife went into the business to turn off the alarm and closed the entry door. The owner remained outside the business. A man, who the owner identified as Richardson, approached him and asked for the time. The owner then heard something, turned, and saw King pointing a gun at him. The owner looked back at Richardson and saw he also had gun.

The men instructed the owner to tell his wife to open the entry door or they would shoot him. The owner knocked on the entry door, and his wife opened it. Once she opened the door, King pointed a gun at her head and asked where the money was located. Richardson stayed with the owner and kept his gun pointed at the owner's chest. The wife opened the safe and King took some money. After King took the money, Richardson kept his gun pointed at the owner and told him not to call the police or they would shoot him. The men then fled. The robbery lasted about five minutes, and the robbers took about $6,000 to $7,000. At trial, Richardson denied any involvement with the April 1988 robbery.

## III.

### VERDICT AND SENTENCE

In June 1989, a jury found Richardson guilty of (1) the first degree murder of Phillip Brower (§ 187), (2) the attempted robbery of Cash Unlimited on May 2, 1988 (§§ 664, 211), and (3) the robbery of the other check cashing business in April 1988 (§ 211). The jury also found true that

Richardson "was armed with a firearm" during the attempted robbery of Cash Unlimited and "personally used a firearm" during the April 1988 robbery.[4] Richardson was sentenced to 26 years to life in prison.

## IV.

### THE RESENTENCING PETITION

In 2018, the Legislature passed Senate Bill No. 1437 (SB 1437). SB 1437 "amended the natural and probable consequences doctrine for murder and the felony-murder rule 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.] [SB 1437] also provided for retroactive application of these amendments by creating a process in section 1170.95 [(now § 1172.6)] through which qualifying defendants can have their murder convictions vacated and be resentenced." (*People v. Cruz* (2020) 46 Cal.App.5th 740, 746.)

To seek relief under section 1172.6, a convicted murderer must file a petition that sets forth a prima facie case for relief. (*People v. Strong* (2022) 13 Cal.5th 698, 708.) If that standard is met, the trial court issues an order to show cause. (*Ibid*.) Generally, this leads to "an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable

---

[4] It appears the firearm enhancement tied to the Cash Unlimited robbery was based on vicarious liability. None of the parties have cited any evidence in the record indicating Richardson carried a firearm during the Cash Unlimited robbery. Further, this firearm enhancement was charged under former section 12022, subdivision (a), which "applie[d] '"whether or not such person is personally armed with a firearm."'" (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 626.)

doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by [SB 1437]." (*Id*. at pp. 708–709.)

A few weeks after SB 1437 went into effect, Richardson filed a resentencing petition under former section 1170.95 (the petition). The trial court initially denied the petition on grounds SB 1437 violated the California Constitution. This Court reversed that ruling and remanded the petition back to the trial court.

On remand, the prosecution conceded the petition stated a prima facie case for relief but objected to resentencing. The trial court issued an order to show cause, and an evidentiary hearing was held in June 2023. The court subsequently denied the petition. It found beyond a reasonable doubt that Richardson could still be convicted of murder today under a felony-murder theory because he was a major participant in the robbery and acted with reckless indifference to human life.

Richardson appeals the denial of the petition on grounds there is insufficient evidence to support the trial court's ruling.

DISCUSSION

I.

BACKGROUND LAW

Under current law, "[a] participant in the perpetration . . . of a [robbery] in which a death occurs is liable for murder" if "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e)(3).) "Whether [the defendant] was a major participant in the underlying felonies who acted with reckless indifference to human life is predominantly a factual question reviewable for substantial evidence." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480 [discussing the standard of review applicable to a section 1172.6 petition].)

8

"'In applying the substantial evidence test, we view the facts in the light most favorable to the [prevailing party], resolving all conflicts in [its] favor and accepting all reasonable inferences deduced from the evidence.'" (*People v. Shrier* (2010) 190 Cal.App.4th 400, 412.) "'[A]n appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the [fact finder's] findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.' [Citation.] We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144–145. "'"The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts.'"'" (*People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 329.)

A defendant's culpability for felony murder is judged on a spectrum. As our state Supreme Court explained in *People v. Banks* (2015) 61 Cal.4th 788, 799–802 (*Banks*), two United States Supreme Court cases are useful in understanding the opposing ends of this spectrum: *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*). Both *Tison* and *Enmund* discussed the constitutionality of imposing the death penalty in felony-murder cases. But California courts have applied their analysis in assessing felony-murder culpability in noncapital cases. (See, e.g., *Banks*, at pp. 799–802.)

In *Enmund*, "defendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they

entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death." (*Banks*, *supra*, 61 Cal.4th at p. 799.)

"On these facts, the United States Supreme Court reversed Enmund's death sentence as prohibited by the federal Constitution. The court found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.] Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' [Citation.] The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' [citation], a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' [citation] cannot constitutionally be sentenced to death." (*Banks*, *supra*, 61 Cal.4th at p. 799.)

The United States Supreme Court revisited this issue again in *Tison*. "Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the

10

cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. [Citation.] Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was "'very substantial'" and they could have foreseen their actions would "'create a grave risk of . . . death.'"" (*Banks*, *supra*, 61 Cal.4th at pp. 799–800.)

"The United States Supreme Court granted Ricky's and Raymond's petitions to consider the application of *Enmund* to these facts. The court began by discussing at length and endorsing *Enmund*'s holding that the Eighth Amendment limits the ability of states to impose death for 'felony murder *simpliciter*.' [Citation.] Specifically, *Tison* described the range of felony-murder participants as a spectrum. At one extreme were people like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme were actual killers and those who attempted or intended to kill. [Citation.] Under *Enmund*, *Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter. [Citation.] The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison brothers, fell 'into neither of these neat categories.' [Citation.] Here, the court announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.'" (*Banks*, *supra*, 61 Cal.4th at p. 800.)

11

As explained by our state Supreme Court, "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund. The defendants' actions in [*Tison*] and [*Enmund*] represent points on a continuum. [Citation.] Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for" felony-murder culpability. (*Banks*, *supra*, 61 Cal.4th at pp. 802, 804; § 189, subd. (e)(3).)

We begin by reviewing whether Richardson was a major participant in the robbery and then assess whether he acted with reckless indifference to human life.

## II.

### MAJOR PARTICIPANT

"[A] 'major participant' in a robbery is someone whose 'personal involvement' is 'substantial' and 'greater than the actions of an ordinary aider and abettor . . . .' [Citation.] However, he or she 'need not be the ringleader.'" (*In re Harper* (2022) 76 Cal.App.5th 450, 459.) Factors that courts consider are (1) "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? [(2)] What role did the defendant have in supplying or using lethal weapons? [(3)] What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? [(4)] Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? [(5)] What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the

12

ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

Richardson does not appear to contest the trial court's finding that he was a major participant in the robbery. His analysis only focuses on the reckless indifference factors. Nonetheless, we address the relevant factors below and conclude Richardson was a major participant in the underlying robbery.

The first and second factors weigh heavily against Richardson. He could reasonably be characterized as the ringleader of the robbery. He raised the idea of committing a robbery because he was short on money. He chose Cash Unlimited as the target, a place he had previously visited. He recruited Curtis as the getaway driver. He also jointly planned the robbery with King. Significantly, he gave King the gun used to commit the murder. While Richardson claimed the gun was unloaded when he gave it to King, a fact finder could disbelieve this testimony. Besides, even if he gave King an unloaded gun, Richardson admitted to seeing King load the gun on the way to Cash Unlimited. Thus, Richardson knew the gun was loaded prior to the commencement of the robbery.

The third factor also weighs heavily against Richardson. Richardson had participated in another armed robbery with King a month prior to the Cash Unlimited robbery. During the prior robbery, Richardson had pointed a gun at the owner and threatened to shoot him if he called the police. Likewise, Richardson and King had threatened to shoot the owner if he did not get his wife to open the door to the business. A fact finder could reasonably conclude that Richardson and King meant these threats. As such,

13

Richardson knew there was a substantial risk of death during an armed robbery if someone resisted.

There is also evidence that Richardson was aware King would shoot someone if confronted during an armed robbery. He knew King was in a gang. Richardson also stated that he was scared of King and thought King might shoot him if he "punked out" of the robbery. If Richardson believed King might shoot him—his roommate who he had known for more than a year—it can be reasonably inferred he knew King was dangerous and could shoot a stranger that interfered with the robbery.

The fourth and fifth factors weigh slightly against Richardson. He was at the scene of the killing. He could have attempted to persuade King to use an unloaded gun if he was concerned about safety during the robbery. However, we recognize that the shooting occurred quickly, and Richardson had little time to intervene once guns were drawn. After lethal force was used, Richardson fled. He did not attempt to check if the victim was alive or call for help. Given the presence of the customers, though, Richardson could reasonably believe one of them would provide aid or call for help. Still, the fact remains that he did nothing to aid the victim after the shooting. As such, these factors weigh slightly against Richardson.

All five factors cut against Richardson, with three of them weighing heavily against him. Based on the evidence discussed above, a fact finder could reasonably conclude Richardson was a major participant in the robbery.

## III.

### RECKLESS INDIFFERENCE

"Reckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave

risk of death."'" (*Banks, supra,* 61 Cal.4th at p. 807.) There is significant overlap between the reckless indifference and major participant requirements. "'[T]he greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).) In cases where a defendant is found to be a major participant in a felony, "'that fact [will] often provide significant support for [a reckless indifference] finding.'" (*Ibid.*)

In determining whether a defendant acted with reckless indifference to human life, courts consider (1) the defendant's "knowledge of weapons, and use and number of weapons"; (2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim"; (3) "duration of the felony"; (4) "defendant's knowledge of cohort's likelihood of killing"; and (5) "defendant's efforts to minimize the risks of the violence during the felony." (*Clark, supra,* 63 Cal.4th at pp. 618–622, capitalization & italics omitted.) None of these factors "'is necessary, nor is any one of them necessarily sufficient.'" (*Id.* at p. 618.) However, we note that "'[t]he intent to commit an armed robbery' or '[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life.'" (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 (*Bradley*).)

The first and fourth factors weigh strongly against Richardson. As discussed above, Richardson gave King the gun used to commit the murder. And, even if the gun was unloaded, Richardson saw King loading the gun in the car. Thus, he knew King was bringing a loaded gun—a gun supplied by Richardson—to the robbery. "While not sufficient of itself in determining reckless indifference, the aider and abettor's awareness that a firearm will be used in the commission of the underlying felony is

15

nevertheless significant." (*People v. Rodriguez* (2021) 66 Cal.App.5th 749, 771–772.)

As to the fourth factor, "[a] defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis . . . ." (*Clark*, *supra*, 63 Cal.4th at p. at p. 621.) "A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.'" (*Ibid*.) Richardson knew King was a gang member. He was also aware that King was dangerous, as he testified to his fear that King might shoot him if he "punked out" of the robbery. Yet Richardson still recruited King to participate in the Cash Unlimited robbery and gave him a gun. Moreover, in their prior robbery, Richardson saw King point a gun at the owner and threaten to shoot him if he did not get his wife to open the door. He had also seen King point a gun at the head of the owner's wife. Based on this evidence, it can be reasonably inferred that Richardson knew King might shoot someone during the course of an armed robbery.

The fifth factor also cuts against Richardson. He argues that he attempted to minimize the risk of violence by committing the robbery during daytime business hours. However, this fact could be interpreted to support the opposite conclusion. For example, in *In re Parrish* (2020) 58 Cal.App.5th 539, 544, the trial court found the defendant had failed to minimize the risks of a robbery because it "was *not* planned for after business hours, when fewer people would be present." (Italics added.)

Here, three customers were waiting for Cash Unlimited to open when the Browers arrived. Richardson and King were outnumbered, which increased the chances of outsider intervention and violence. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 (*McDowell*).) The presence of

16

these witnesses also increased the risk that a bystander could be shot. (See *Bradley, supra*, 65 Cal.App.5th at p. 1034 ["The jury could reasonably have concluded the public nature of the robbery and presence of others increased the risk of someone being injured"].) To minimize the risk of violence, Richardson could have altered the plan and returned when there were no customers. He did not. He also could have insisted that King carry an unloaded gun to eliminate the risk of a shooting. He did not. Nor is there any evidence in the record showing Richardson and King discussed ways to minimize violence. (See *ibid*. [defendants did not attempt to minimize risks of robbery because they "never discussed whether they should bring firearms, whether to keep those firearms unloaded, or how to minimize the likelihood of violence"].)

The second and third factors weigh slightly against Richardson and are weaker factors in this case. Richardson was present for the entire robbery. He and King left the car and walked to Cash Unlimited together and then waited for Cash Unlimited to open. He was also present during the shooting. Richardson argues that the shooting occurred quickly, and there was nothing he could do to intervene and prevent its occurrence. We acknowledge the shooting occurred quickly, and there was little time for Richardson to intervene once guns were drawn. But Richardson's argument also fails to consider that he and King waited for around 10 minutes for Cash Unlimited to open. They saw the customers waiting. As discussed above, after seeing the customers, Richardson could have insisted they return when no customers were present. In other words, Richardson had several minutes to restrain the crime but did not do so. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593; *Bradley, supra*, 65 Cal.App.5th at p. 1034.)

17

Richardson also argues that he tried to restrain the crime because he attempted to call off the robbery after he and King arrived at Cash Unlimited. But a fact finder could reasonably disbelieve his testimony. Indeed, an eyewitness testified that she did not see Richardson and King talk to each other after they arrived at Cash Unlimited.

Finally, while Richardson did not offer any aid or call for help after the shooting, we acknowledge that he could have been startled or could have expected other people in the crowd to call for help. Thus, his failure to provide aid or call for help is not particularly probative here.

Based on the totality of the circumstances, particularly the first, fourth, and fifth factors, there is sufficient evidence that Richardson acted with reckless indifference to human life. For example, in *McDowell*, *supra*, 55 Cal.App.5th 999, the defendant and his accomplice (the robbers) knocked on a drug dealer's door in the middle of the night. The drug dealer was at home with two other men, and they let the robbers in. The defendant was armed with a knife. It was unclear whether he knew his accomplice had a gun prior to the commencement of the robbery. Once inside the house, one of the robbers demanded that the dealer give them his stash of drugs. The accomplice then fired a warning shot into the floor next to the dealer. One of the dealer's guests then struck the defendant with an object, knocking him over. The dealer then tried to grab the gun from the accomplice. The accomplice shot the dealer, and the two robbers fled. The dealer was shot "only 'a few seconds'" after the accomplice first shot into the floor, and the entire incident only lasted around a minute. (*Id*. at p. 1005.)

The defendant was found guilty of murder. (*McDowell*, *supra*, 55 Cal.App.5th at p. 1006.) He later filed a habeas petition arguing there was insufficient evidence that he had acted with reckless indifference for human

life. (*Id.* at pp. 1006, 1012.) The trial court disagreed and denied his petition. First, the defendant was armed with a knife. While there was evidence the defendant did not know his accomplice had a gun, he became aware of the gun when the warning shot was fired. (*Id.* pp. 1005–1006, 1012.) However, nothing in the record showed the defendant knew of the accomplice's capacity for violence prior to the robbery. (*Id.* at p. 1014.) Second, the defendant made no attempt to decrease the risks of lethal violence of a home robbery of a drug dealer. The court noted it was foreseeable that customers might be present. Further, it was obvious that the robbers were outnumbered when they entered the house "increasing the chances of resistance," but the defendant still proceeded. (*Id.* at pp. 1013–1014.) Third, the defendant made no attempt to deescalate the situation after the warning shot. (*Id.* at p. 1014.)

On balance, we find this case similar to *McDowell.* Both cases involved armed robberies gone wrong. In both, the robbers were outnumbered and caught by surprise by the victim, which caused the accomplice to quickly shoot the victim. Likewise, in both, the robbers made no apparent attempts to minimize the risk of violence and could have walked away from the robbery after seeing they were outnumbered. Both Richardson and the defendant in *McDowell* were at the scene of their respective robberies for their entirety and fled once shots were fired.

There are certainly differences between the two cases. In *McDowell*, the defendant was armed with a knife, the robbers targeted a drug dealer at his home at night, and there were a few seconds to deescalate things after the accomplice's warning shot. However, these differences are offset by several circumstances in this case that were not present in *McDowell.* Here, there is evidence showing Richardson (1) armed King with the gun and knew the gun was loaded prior to the robbery; (2) knew of King's

19

gang affiliation and feared King might shoot him, (3) had seen King threaten to kill the owner and point a gun at the owner's wife in their prior robbery; and (4) had around 10 minutes to observe the customers waiting for Cash Unlimited and potentially call off the robbery.

Richardson argues the trial court failed to consider how his youth at the time of the killing—he was 17 years old and 10 months—impacted his ability to understand the potential risks of the armed robbery. A court may "consider[] evidence in the record about the defendant's youth that [bears] directly" on the above factors. (*In re Harper*, *supra*, 76 Cal.App.5th at pp. 469–470.) However, such evidence must be considered against the totality of the circumstances. (*Id*. at p. 470.) Here, the court did consider Richardson's age. It acknowledged "that the brain of a child who is a couple months shy of his 18th birthday on the date of this murder is not fully developed, and that the hallmark features of youth include immaturity, impetuosity, and failure to appreciate risks and consequences. [Citation.] The evidence in this case demonstrates the factors outlined in the *Banks* and *Clark* analysis prove that [Richardson] did act with reckless disregard and was a major participant."

We find no error in the trial court's analysis. Richardson contends his belief that Cash Unlimited "would be 'easy' to rob" indicates "he had given no thought to the possibility of Philip Brower resisting, being armed, or being willing to fire a gun while a crowd of people surrounded the door to his business." But this by itself is insufficient to show his youth is a material factor here. As set forth above, Richardson was one of the primary planners of the robbery. He had committed an armed robbery with King a month prior to the Cash Unlimited robbery in which he had threatened to kill the owner. He knew King was capable of violence but still gave him a gun prior to the robbery. He also had several minutes to observe the customers prior to the

20

arrival of the Browers. While Richardson may not have been able to anticipate exactly how the shooting would unfurl, there is enough evidence in the record to show he was recklessly indifferent to human life.

## DISPOSITION

The trial court's order denying the petition is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.

21